George JARRO, Plaintiff,

v.

UNITED STATES of America and Anderson Meat Distributors Co., Defendants.

No. 92–853–Civ.

United States District Court, S.D. Florida.

Aug. 27, 1993.

---

**607**

Philip T. Weinstein, Miami, FL, for plaintiff.

Mark Steir, U.S. Dept. of Justice, Tax Div., Washington, DC, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARCUS, District Judge.

THIS CAUSE was tried without a jury before the undersigned on March 29, 1993. By this action, Plaintiff, George Jarro, seeks to enjoin Defendant, the United States of America, from further levying against his sales commissions and seeks a refund for amounts previously seized pursuant to what Plaintiff contends is a wrongful levy.[1] Jurisdiction is conferred by Title 28 U.S.C. §§ 1346(e) and 1340, and Title 26 U.S.C. § 7426. In accordance with Federal Rule of Civil Procedure 52(a), the Court makes the following Findings of Fact and Conclusions of Law.

### I. Findings of Fact

1. As of August 3, 1987, George Jarro was president and sole shareholder of Coral Steak Company, Inc. ("Coral Steak"), a Florida corporation in the business of selling meat wholesale to restaurants and hotels.

2. Coral Steak incurred a payroll tax liability to the United States in excess of $130,000, before it ceased operations in or about January 1991. The "trust fund" portion of payroll taxes are amounts actually withheld from the salaries of employees on account of income tax withholding, FICA and medicare tax. The "non-trust fund" component is the employer's contribution. The I.R.S. collected the penalty for the "trust fund" portion of the liability from Jarro individually, but the "nontrust fund" portion was collectible only from Coral Steak.

3. Jarro was a broker on commission in the business of selling meats to the more expensive, "up-scale" restaurants in South Florida. The names of these customers are well-known to those in the business, and any meat salesperson would be free to solicit business for his meat distributing company from any of these restaurants. By providing punctilious service and a consistently high-quality product, Jarro had developed and accumulated a list of steady customers who bought from him regardless of the source of the meat, as evidenced by his continued relationships with many of these restaurants despite Jarro's having worked for several different distributors during the course of those relationships. This list of steady customers had meaning only insofar as it was associated with George Jarro. In the hands of another meat salesperson or broker, the list would have had little more value than a copy of *Zagat's*.

4. On February 19, 1991, or March 5, 1991, Jarro held a stockholders and directors meeting of Coral Steak, the minutes of which provided, in pertinent part:

Upon motion duly made and unanimously agreed it was resolved as follows:

1. To approve the exchange of all of the rights, title and interest in all of his customer accounts of the corporation for 100% of the issued Capital Stock of the corporation ... and therefore to proceed to transfer and assign all of the rights, title and interest of the corporation in and to all of his customer accounts to GEORGE JARRO and therefore hereby authorize the President of the corporation to proceed to execute on this day a proper Bill of Sale for such transfer.

Pl.Ex. 2.

5. Then, on February 20, 1991, Jarro entered into an agreement with Anderson Meat

---

1. The parties have stipulated that Anderson Meat Distributors, Co., the garnishee, is only a nominal defendant, and that the real defendant-in-interest is the United States.

Distributors Co. ("Anderson Meat") for the stated purpose of "selling all of his customer accounts to the PURCHASER and ... providing all necessary services in order to maintain such accounts as accounts of the PURCHASER." *See* Pl.Ex. 3 at 1. The agreement provided for compensation in the form of commissions according to a detailed formula. *See* Pl.Ex. 3, at ¶ 2(A). The formula entitled Jarro to a lesser commission based on gross sales, as well as a higher percentage based on gross profits in order to encourage more profitable accounts. By the terms of the agreement, the formula would change once a total of $385,000 was paid to Jarro over the course of his employment by Anderson Meat. *See* Pl.Ex. 3, at ¶¶ 2(A), 4. On June 18, 1992, Anderson Meat was sold to Superior Meat Co., Inc., which assumed the agreement between Anderson Meat and Jarro.

6. On or about March 3, 1991, the I.R.S. served a Notice of Levy for $218,042.80 upon Anderson Meats with respect to the amounts payable to Jarro pursuant to the February 20 agreement in an attempt to collect the unpaid "trust fund" payroll tax liability of Coral Steak. The I.R.S. levy listed Jarro as the "nominee" of Coral Steak. By the time of trial, the I.R.S. had collected in excess of $10,000 of Jarro's commissions pursuant to the Notice of Levy.

## II. *Conclusions of Law*

1. In a wrongful levy action, such as this, the plaintiff bears the initial burden to show that the government has levied on the plaintiff's property to collect taxes or penalties owed by another taxpayer. *See Morris v. United States*, 813 F.2d 343, 345 (11th Cir.1987). The burden then shifts to the Government to show by "substantial evidence" a nexus between the property seized and the liable taxpayer. The plaintiff, however, bears the ultimate burden of persuasion.

2. There is no dispute that the I.R.S. had a lien on the property of Coral Steak prior to February 19, 1991, and no dispute that tax liens follow the property to which they have attached wherever it may be transferred. *See United States v. Bess*, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958).

3. The Government contends that the customer accounts were property of Coral Steak to which the tax lien attached, and that when Jarro exchanged his stock in Coral Steak for the customer accounts, he obtained the accounts subject to the lien. The Government's theory, more precisely, is that the customer list comprised the "goodwill" of Coral Steak; that Florida law recognizes goodwill as an asset that can be bought and sold; that the tax lien attached to this asset; that Jarro himself treated the customer lists as an asset belonging to Coral Steak as evidenced by the corporate minutes of the share exchange, and the purchase and sales agreement with Anderson Meat under which Jarro sold the accounts to Anderson Meat for $350,000; and therefore, given Jarro's treatment of the asset as transferrable, marketable and belonging to Coral Steak, the levy could justifiably attach to income stream generated by the customer list in the hands of Jarro.

Alternatively, the Government argues that the Court should pierce the corporate veil of Coral Steak to reach the assets personal to Jarro because the exchange of stock for customer accounts was essentially the sale of the corporation's only asset for no consideration, which transaction was designed to fraudulently deceive Coral Steak's creditors, and because the corporation was improperly dominated by Jarro, its sole shareholder.

Jarro, on the other hand, argues that the list of customer accounts was all along his personal property, and that the income stream from sales to those restaurants belonged wholly to him, and never to Coral Steak. Furthermore, the agreement with Anderson Meat was, despite its express designation of "purchaser" and "seller," an employment contract, and the stock sale was arranged solely to assuage the concerns of Anderson Meat's counsel that some other entity could have a claim to Jarro's customer list.

Thus, the essential question to be resolved is whether the list of customers was an asset of Coral Steak, or whether it was something else which could be said to belong to Jarro personally.

■ 4. The alienation of the customer list from the salesperson is a fiction. Significant value can be placed on a corporate name or trademark, and significant sums paid for the use of that name or mark—even without any other supporting assets—because the name itself has meaning in the marketplace. Such an abstraction can be bought and sold precisely because the ownership of the trade or mark is irrelevant to its meaning and value. The customer list divorced from context, to the contrary, is nothing more than a list of South Florida restaurants which are always free to buy meat from another salesperson, broker or distributor, and has no value by itself. The evidence developed in this case has established that the list has meaning *only* when viewed as a group of chefs and food service managers with whom George Jarro personally has, over years, developed solid rapport and relationships of mutual trust. Any value attributed to this list thus inheres peculiarly in George Jarro and no one else. For this reason alone the customer list cannot realistically be equated with goodwill and thus cannot be said to have been a corporate asset of Coral Steak.

5. Although the corporate minutes indicate that Jarro exchanged his stock for the list of customers belonging to Coral Steak, the "list" was his already, and the stock represented the total ownership share in a defunct company with a negative net worth. Jarro's board resolution with himself, as recorded by the corporate minutes, was purely a fictitious device to dissolve a company, orchestrated at the behest of Anderson Meat to satisfy imaginary legal concerns. It would defy reason and the evidence presented to find that this meaningless exchange somehow transformed this asset from something personal into something corporate.

6. Likewise, the Anderson Meat employment agreement was between Anderson Meat and George Jarro *individually*, and not in his corporate capacity. On the whole record presented, the agreement is insufficient to prove that the asset was corporate. The terms "purchaser" and "seller" used in the agreement cannot transform the essence of this deal from an employment arrangement into an asset sale.

■ 7. Additionally, we can find no reason to disregard the fiction of the corporate separateness of Coral Steak by holding that Jarro was the nominee or alter ego of Coral Steak. Equity will permit a court to ignore the corporate form where a dominant shareholder has himself done so. The standard for ignoring the corporate device

> is a practical one, based largely on a reading of the particular factual circumstances. The fact of sole ownership is not by itself sufficient, although it is certainly not irrelevant. Evidence of plain fraud is similarly of probative value, though not a prerequisite.... [T]he court may ignore existence of the corporate form whenever an individual so dominates his organization "as in reality to negate is separate personality."

*Valley Finance, Inc. v. United States,* 629 F.2d 162, 172 (D.C.Cir.1980), *cert. denied sub nom, Pacific Development, Inc. v. United States,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981). Of particular relevance to this last factor is whether corporate funds were used to pay the individual's personal expenses. *See Shades Ridge Holding Co., Inc. v. United States,* 880 F.2d 342, 345 (11th Cir.1989). Here, the United States has offered no basis for piercing the corporate veil of Coral Steak, save that Jarro was the sole shareholder and the difficulty for the United States of collecting on the unpaid payroll taxes. The Government has made no showing that any fraud was perpetrated, that the corporation was undercapitalized, that Jarro used corporate funds to satisfy personal debts, or that Jarro did not obey corporate formalities. The argument that Jarro drained the corporation of its major asset by exchanging his stock for the customer list is not persuasive especially because we have already established that the accounts belonged to Jarro in the first place. Consequently, we decline to pierce the corporate veil of Coral Steak.

8. In sum, the commissions levied upon by the I.R.S. from Anderson Meat constituted monies due George Jarro for personal services, and not property traceable to Coral Steak. The levy was therefore wrongful. *See* 26 U.S.C. § 7426. Accordingly, it is hereby

ORDERED AND ADJUDGED that

The United States of America is PERMA-NENTLY ENJOINED from levying, on account of the corporate tax liability of Coral Steak, against any of the commissions payable to George Jarro from Anderson Meat, its successors or assigns; and

The United States of America shall FORTHWITH REFUND to George Jarro all monies previously collected pursuant to the wrongful levy, together with statutory interest.

Plaintiff is directed to submit a proposed order of final judgment within fifteen (15) days of the date of this Order.

DONE AND ORDERED.